OPINION OF THE COURT
David D. Egan, J.
This is a death penalty case. Defendant John Owens moves this court for an order suppressing the results from the People’s *839 Deoxyribonucleic Acid (DNA) testing, or in the alternative to conduct a Frye hearing. (Frye v United States, 293 F 1013 [DC Cir 1923].) The People oppose the motion.
Defendant is being tried for crimes against three victims arising out of separate incidents that occurred within a two-month period in 1999. Counts one and three of indictment No. 547/99 arise out of the murder of Rosemarie Constantino, who was killed in the course of a rape in the Maplewood area in the City of Rochester on April 28-29, 1999, and charge defendant with murder, first degree (Penal Law § 125.27 [1] [a] [vii]; [b]), and murder, second degree (Penal Law § 125.25 [1]), respectively. Counts two and four of the same indictment and count one of indictment No. 414/99 (previously consolidated by order of this court dated November 22, 1999) arise out of the alleged murder and rape of Sherry Tuthill at 200 Merlin Street, City of Rochester, on May 30-June 1, 1999. (See People v Owens, Monroe County Ct, Nov. 22, 1999, Egan, J., motion No. DA-1.) Defendant is charged with murder, first degree (Penal Law § 125.27 [1] [a] [vii]; [b]), murder, second degree (Penal Law § 125.25 [1]) and reckless or depraved indifference murder, second degree (Penal Law § 125.25 [2]) relating to this incident. Counts five and six both charge defendant with rape, first degree (Penal Law § 130.35 [1]), arising out of the alleged rapes of “R.L.” on June 6, 1999.
The People allege that defendant raped all three victims, choked them and beat them about the head. Bloodstains were collected from objects at two of the crime scenes located below the Driving Park Bridge, and at 6 Whitney Street, and at defendant’s apartment at 73 Walnut Street, all in the City of Rochester. Semen samples and bloodstains also were collected from the victims and their clothing. All bloodstains and semen samples were compared with blood drawn from the defendant and the victims.
At the People’s request, the Monroe County Public Safety Laboratory (MCPSL) and Cellmark Diagnostic Laboratory (Cellmark) conducted DNA testing, analyzing different loci or areas of the DNA. Both MCPSL and Cellmark initiated their DNA testing with polymerase chain reaction (PCR) amplification, but then used different DNA profiling or typing methods. MCPSL used a polymarker reverse dot blot system, the Amplitype PM (Polymarker) and DQA1. Cellmark used a short tandem repeat (STR) analysis.
The MCPSL report indicates the DNA profile of all of the sperm samples matched exactly the DNA profile of the blood *840 sample of the defendant at six loci analyzed (using the Poly-marker and DQAl analysis). The probability of randomly selecting an unrelated person having the same Polymarker and DQA1/DNA profile as defendant and the sperm fractions on the vaginal swabs from Rosemarie Constantino, Sherry Tuthill, and R.L. and on the swab from the knee of Sherry Tuthill is approximately 1 in 6,100 African Americans, 1 in 380,000 Caucasians, 1 in 169,000 Hispanics, and 1 in 221,000 Japanese.
The Polymarker and DQAl/DNA profile of the blood found both in the kitchen and on the porch of defendant’s apartment matched the DNA profile of Sherry Tuthill’s blood. Finally, the same type of DNA profiling indicated the blood found on a sweatshirt in the defendant’s apartment matched the DNA profile of R.L.’s blood.
Defendant does not dispute the general acceptance by the scientific community of Amplitype PM and DQAl analysis use by the Monroe County Public Safety Laboratory. (See People v Hamilton, 255 AD2d 693, 694 [3d Dept], lv denied 92 NY2d 1032 [1998]; People v Morales, 227 AD2d 648 [2d Dept], lv denied 89 NY2d 926 [1996].)
Cellmark’s report indicated the DNA profile of all of the sperm samples matched exactly the DNA profile of defendant’s blood sample at the 13 short tandem repeat loci tested. The probability of randomly selecting an unrelated person having the same STR/DNA profile as defendant and the sperm fractions from the vaginal swabs of Rosemarie Constantino, Sherry Tuthill, and R.L. and from the swab from the knee of Sherry Tuthill is approximately 1 in 18 X 10 to the 18th African Americans, and 1 in 6.5 X 10 to the 21st Caucasians.
A STR/DNA profile of the blood found both in the kitchen and on the porch of defendant’s apartment matched the STR/ DNA profile of Sherry Tuthill’s blood. Finally, a STR/DNA profile of blood found on a sweatshirt in the defendant’s home matched the STR/DNA profile of R.L.’s blood.
Defendant maintains the STR/DNA profiling, using the AmpFISTR Profiler Plus and COfiler PCR kits, is not reliable or generally accepted by the scientific community. Specifically, defendant argues that AmpFISTR Profiler Plus and COfiler PCR kits have not been subjected to peer review and validation.
This court denied defendant’s request for a Frye hearing on the record on March 20, 2001. (See Frye, supra.) No one contests the admissibility of expert testimony concerning the *841 polymerase chain reaction method used in the DNA testing. PCR allows for the amplification or chemical copying of DNA samples. “ ‘The reliability of the PCR method has gained general acceptance in the scientific community’.” (People v Fontanez, 278 AD2d 933, 935 [4th Dept 2000] [citation omitted]; see People v Qi Zhong Lin, 267 AD2d 256, 256-257 [2d Dept 1999], lv denied 94 NY2d 951 [2000]; see People v Hall, 266 AD2d 160, 160-161 [1st Dept 1999], lv denied 94 NY2d 948 [2000]; People v Hamilton, supra, at 694.)
PCR STR profiling methods involve the generally accepted procedures entailed with PCR using a number of loci known as short tandem repeats. Short tandem repeats contain repeat units that are two to six basepairs in length. The STRs can be readily amplified with polymerase chain reaction.
With the Profiler Plus and COfiler PCR, visualization of the DNA is accomplished with the use of a fluorescent tag primer. The Profiler Plus and COfiler PCR target nine and six STRs, respectively. Electrophoresis is done through a capillary instead of a gel as with some other amplification kits. As the DNA, in order of its size, passes through the capillary a laser is directed at it. The laser excites the fluorescent tag, giving off a particular wavelength, which in turn is detected by a machine called a 310 Genetic Analyzer. The fluorescence passing by the window creates a profile of peaks, measured on fluorescent units. Two peaks will appear for each locus, one peak for each allele. Through a series of comparisons with controls that are also run on the capillary, one can translate the peaks into the number of repeats. (See National Institute of Standards & Technology, STR Typing Technology Review [Jan. 30, 2001]; People v Pfenning, Vt Dist Ct, Apr. 6, 2000, Kupersmith, J., docket No. 57-4-96.)
Courts throughout the country have found that the STR/ DNA profiling, using the AmpFISTR Profiler Plus and COfiler PCR kits, is reliable and generally accepted by the scientific community. (People v Phillips, Mich Cir Ct, Kent County, Oct. 25, 2000, Kolenda, J.; People v Kopp, Mich Cir Ct, Kent County, Oct. 20, 2000, Soet, J.; People v. Cavin, Mich Cir Ct, Lake County, Oct. 18, 2000, Cooper, J., No. 00-4395-FY; People v Elizarraras, Cal Super Ct, Tulare County, Oct. 13, 2000, Kalashian, J., case No. 50651; Minnesota v Dishmon, Minn Dist Ct, Hennepin County, Mar. 3, 2000, Anderson, J., No. 99047345; Arizona v Lynch, Ariz Sup Ct, Maricopa County, Aug. 20, 1999, Reinstein, J., CR No. 98-11390; Florida v Yisrael, Fla Cir Ct, Broward County, Aug. 8, 2000, Cohn, J., *842 No. 99-20176CF10A [on the record]; cf. Commonwealth v Gaynor, Mass Super Ct, Hampden County, Apr. 27, 2000, Ford, J. [assumes acceptability of STR/DNA profiling, using the AmpFISTR Profiler Plus and COfiler PCR kits].) General scientific acceptance, not universal acceptance, is required. “[T]he particular procedure need not be ‘unanimously indorsed’ by the scientific community but must be ‘generally acceptable as reliable.’” (People v Wesley, 83 NY2d 417, 423 [1994], quoting People v Middleton, 54 NY2d 42, 49 [1981]; cf. People v Schreck, Colo Dist Ct, Boulder County 2000, Hale, J., case No. 98CR2475, and People v Pfenning, supra [relied upon by the defendant].) The People also provided this court with ample abstracts of symposium and conference presentations and articles supporting the validation of both AmpFISTR Profiler Plus and COfiler PCR kits and STR/DNA profiling in general.
This court finds, while not alone dispositive, that STR is in widespread use in forensic laboratories because low amounts of DNA even in degraded form can be successfully typed. Further, at least three appellate courts have held predecessor PCR/STR DNA profiling kits are reliable and generally accepted by the scientific community. (People v Allen, 72 Cal App 4th 1093, 85 Cal Rptr 2d 655 [1999]; Nebraska v Jackson, 255 Neb 68, 582 NW2d 317 [1998]; Commonwealth v Rosier, 425 Mass 807, 685 NE2d 739 [1997]; see also, People v Moevao, Cal Super Ct, San Francisco, City and County, July 24, 2000, Warren, J. [found the forerunner AmpFISTR Blue and AmpFISTR Green kits admissible; after a 25-day hearing with 8 witnesses and 60 exhibits amassing 2,300 pages of transcripts].) Indeed while ultimately finding the Profiler Plus system unreliable, even the Vermont District Court in People v Pfenning (supra, slip opn, at 49) acknowledged “the use of fluorescent primers and the generalized use of STRs has been in place for some time, as early as 1990 * * * the basic technologies incorporated in Profiler Plus have been utilized as independent entities for longer periods of time are generally recognized as valid scientific techniques.”
Note in People v Santiago, another capital case recently tried in this County, expert testimony concerning the STR/DNA profiling using the AmpFISTR Profiler Plus and COfiler PCR kits was admitted. (See People v Santiago, Monroe County Ct 2000, Bristol, J., No. 99/0210.) In Santiago, the Capital Defender Office did not seek a Frye hearing or contest the reliability or general acceptance in the scientific community of the AmpFISTR Profiler Plus and COfiler PCR kits.
*843 Novel scientific evidence may be admitted without any hearing at all by the trial court. (People v Wesley, supra, at 426, citing Matter of Lahey v Kelly, 71 NY2d 135 [1987]; People v Middleton, 54 NY2d 42, 49 [1981], supra.) As the New York Court of Appeals has found “the modern trend in the law of evidence has been away from imposing a special test on scientific evidence and toward using the ‘traditional standards of relevancy and the need for expertise.’ ” (People v Wesley, supra, at 426, quoting 1 McCormick, Evidence § 203, at 873-874 [4th ed 1992].)
To the extent the court in People v Schroedel (187 Misc 2d 690 [Sullivan County Ct, Mar. 21, 2001, LaBuda, J.]) reached an opposite conclusion in a capital case this court disagrees. The Schroedel court granted defendant’s request for a Frye hearing, but shifted the burden to defendant of proving by a preponderance of the evidence suppression based on the lack of “reliability and general acceptability in the scientific community of the use of ampFISTR Green typing kit and ampFISTR Blue typing kit in DNA profiling methodology used by the New York State laboratory.” (Id., at 694.) The burden of proof in a standard Frye hearing is on the People. The AmpFISTR Green typing kit and AmpFISTR Blue typing kit are the direct forerunners to the kits used in this case. This court finds that to hold such a truncated Frye hearing would serve no legitimate purpose in this case.
Defendant also contests the protocols and procedures of both the MCPSL* and Cellmark. Defendant asserts that the MCPSL mishandled certain samples resulting in potential contamination, and failed to maintain proper documentation on site in violation of the industry’s minimal quality assurance standards. Defendant also questions the accreditation status of the MCPSL. Defendant further claims the technicians employed by Cellmark failed to separate samples under analysis, mislabeled samples, and Cellmark did not properly review the technician’s work.
These are questions of foundation or weight that may be dealt with at trial. To be admissible at trial, scientific evidence must be reliable and generally accepted by the scientific community by a prior court finding and have a proper foundation *844 laid at trial. (People v Wesley, supra, at 422.) “[F]oundation concerns itself with the adequacy of the specific procedures used to generate the particular evidence to be admitted.” (Id.) Defendant shall be permitted to bring the perceived weaknesses in the People’s methodology to the jury’s attention on cross-examination of the People’s expert witnesses. (See People v Vega, 225 AD2d 890 [3d Dept 1996].)
Defendant’s motion entitled DEF-69 is denied in its entirety.

 Defendant also does not dispute the general acceptance by the scientific community of Amplitype PM (Polymarker) and DQA1 analysis use by the Monroe County Public Safety Laboratory. (People v Hamilton, 255 AD2d 693, 694 [3d Dept], supra [see record on appeal], lv denied 92 NY2d 1032 [1998]; People v Morales, 227 AD2d 648 [2d Dept], lv denied 89 NY2d 926 [1996], supra.)